# THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### (EASTERN DIVISION)

| | |
|---|---|
| In re:<br><br>MOLECULAR INSIGHT<br>PHARMACEUTICALS, INC.,[1]<br><br>                Debtor. | Chapter 11<br><br>Case No. 10-23355 (FJB) |

## MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER
## APPROVING THE DEBTOR'S ENTRY INTO (A) A PLAN SUPPORT
## AGREEMENT AND (B) EXIT FINANCING LETTERS

The above-captioned debtor and debtor in possession (the "Debtor" or "Molecular Insight") hereby moves the Court (the "Motion") for entry of an order, substantially in the form annexed hereto as Exhibit A (the "Order"), authorizing: (a) approval of the plan support agreement, dated as of February 28, 2011 and executed by the Debtor on March 1, 2011 (the "Plan Support Agreement," a copy of which is attached as Exhibit B), by and between the Debtor and certain signatory thereto (collectively, the "Consenting Bondholders"), each being a holder of the Bonds (as defined below); (b) approval of (i) that certain exit commitment letter (the "Exit Commitment Letter") and (ii) that certain exit fee letter (the "Exit Fee Letter"), each entered into by and between the Debtor and the certain of the Consenting Bondholders and affiliate entities of certain of the Consenting Bondholders (in such capacity, the "Committed Exit Lenders") and dated as of February 28, 2011 (together, the "Exit Financing Letters"), copies of which are annexed hereto as Exhibit C; and (c) granting related relief, in each case, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"); Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") 2002 and

---

[1] The last four digits of the Debtor's tax identification number are 2086.

4001; and MLBR 2002-1 and 4001-2. In support of the Motion, the Debtor respectfully represents as follows:

## Preliminary Statement

1. On December 9, 2010 (the "Petition Date"), shortly before filing this chapter 11 case, the Debtor entered into an agreement (as subsequently amended, the "Investment Agreement") with Savitr Capital LLC ("Savitr") that provided for Savitr to infuse $45 million in cash to finance a plan of reorganization under which it would receive 100% of the reorganized Debtor's equity. The Investment Agreement provided the Debtor with a valuable capital commitment that was not subject to diligence, financing or other material conditions, but permitted the Debtor to solicit, and if appropriate, pursue an alternative transaction from other interested parties, including the holders of the Bonds (the "Bondholders"). As such, it transformed Savitr into a form of stalking horse whose commitment created several alternative paths to a resolution of the case before the Debtor's cash resources were depleted: submission of competing offers from other parties, most likely the Bondholders; negotiation of an improved offer from Savitr and obtain a consensual plan; or, failing a consensual deal, a contested confirmation process.

2. In mid-January 2011, the Court approved the Debtor's assumption of the Investment Agreement. Thereafter, Debtor received an improved proposal from Savitr, which formed the basis for an initial plan of reorganization (the "Original Plan") that the Debtors filed in early February 2011. Certain of the Bondholders, including the Consenting Bondholders, promptly indicated that they would oppose the Original Plan and, before the end of the marketing period under the Investment Agreement, submitted a proposal for an alternative transaction to the Original Plan (the "Bondholder Proposal") that they contemplated would be implemented through (i) an agreed plan of reorganization (the "Plan") and (ii) debtor in possession and exit

financing to be provided by certain of the Consenting Bondholders and affiliate entities of certain of the Consenting Bondholders.

3. Over the ensuing weeks, the Debtor and the Consenting Bondholders worked to eliminate all material contingencies from the Bondholder Proposal, including fully negotiating a plan of reorganization, and financing and other material agreements. At the conclusion of this process, the Board of Directors of the Debtor, after consultation with its advisors, determined in light of the totality of the circumstances, including the difficulties inherent in seeking to confirm a plan over the objection of the Bondholders, that the Bondholder Proposal was a Superior Proposal (as defined in the Investment Agreement) to the restructuring contemplated by the Investment Agreement.

4. On March 1, 2011, the Debtor entered into (a) the Plan Support Agreement with the Consenting Bondholders, dated as of February 28, 2011 and (b) the Exit Financing Letters and letters providing for debtor in possession financing and related fees (the "DIP Financing Letters") with certain of the Consenting Bondholders and affiliate entities of certain of the Consenting Bondholders, also dated as of February 28, 2011. The Plan Support Agreement provides, among other things, that (x) the Debtor is to file the Plan and Disclosure Statement, each containing terms consistent with the Plan Term Sheet, on or before March 7, 2011 and (y) the Consenting Bondholders are to support confirmation and implementation of the Plan. Together, the Exit and DIP Financing Letters provide the Debtor with the needed capital infusions to provide for a successful emergence from bankruptcy.

5. The Plan and a related disclosure statement (the "Disclosure Statement") have been filed contemporaneously herewith. The overarching purpose of the Plan is to restructure the Debtor's liabilities to maximize recovery to all stakeholders and enhance the financial

viability of the Reorganized Debtor.  The Plan, whose central terms are set forth in the term sheet annexed to the Plan Support Agreement as Exhibit A (the "Plan Term Sheet"), provides for, among other things: (a) $40 million of new capital, to be funded by certain of the Consenting Bondholders and affiliate entities of certain of the Consenting Bondholders pursuant to the Exit Commitment Letter; (b) the conversion of the Bonds into 100% of the new equity in the post-Effective Date Reorganized Debtor; (c) payment to holders of allowed general unsecured claims of their pro rata share of $500,000 in cash; and (d) the cancellation of existing equity interests. The effect of the transaction contemplated by the Debtor will be to restructure the Debtor's balance sheet by, among other things, reducing the Debtor's debt by approximately $162 million and facilitating a new capital infusion of approximately $40 million.

6.     The Debtor has determined in the exercise of its business judgment that the surest path toward a successful reorganization is through acceptance and implementation of the Bondholder Proposal: a transaction that has the support of virtually the entire class of the Debtor's secured lenders and that provides a significant capital infusion to the Debtor.

## Jurisdiction and Venue

7.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

8.     The statutory predicates for the relief sought herein are sections 105(a) and 363(b) of the Bankruptcy Code, Bankruptcy Rule 2002 and 4001, and MLBR 2002-1 and 4001-2.

## Relief Requested

9.     The Debtor seeks, under section 363(b)(l) of the Bankruptcy Code, (a) the Court's approval of the Plan Support Agreement and (b) the Commitment and Fee Letters.

**Background**

10. On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts, Eastern Division (the "Chapter 11 Case").

11. Molecular Insight is a clinical biopharmaceutical company and a pioneer in the emerging field of molecular medicine in the detection and treatment of various forms of cancer and other life-threatening diseases. It has several product candidates (the "Product Candidates") at various stages of development and/or in different phases in the regulatory approval process in United States and Europe.

12. The Debtor and the Bank of New York Mellon Trust Company, N.A. (f/k/a The Bank of New York Trust Company, N.A.), as collateral agent and trustee ("Indenture Trustee") are parties to an indenture, dated as of November 16, 2007 (the "Indenture"), under which the Debtor issued $150,000,000 in Senior Secured Floating Rate Bonds due 2012 (the "Bonds"). As of the Petition Date, the outstanding balance of the Bonds, including accrued interest, was approximately $202 million (together with any other obligations under the Indenture, the "Prepetition Obligations"). The Prepetition Obligations are secured by first-priority liens and security interests on substantially all of the Debtor's assets.

13. In March 2010, the Debtor fell into non-monetary default of certain of its obligations and began protracted negotiations with the Bondholders and the Indenture Trustee concerning the terms of a potential restructuring. On March 15, 2010, the Bondholders and the Indenture Trustee signed a limited waiver of the Debtor's default of the Indenture. Over the course of the next nine months, they extended this waiver sixteen times, during which time the parties continued their attempts to negotiate a consensual restructuring.

14. In mid-September 2010, Savitr expressed to the Debtor a willingness to invest $45 million of new equity capital into Molecular Insight as part of a global restructuring plan. Though subsequent negotiations involving the Consenting Bondholders collapsed, the Debtor's board of directors concluded that the most effective way to maximize value for the benefit of all of the Debtor's stakeholders and avoid the risk of liquidation was to secure the $45 million of committed capital offered by Savitr, while preserving the ability of other parties, including the Consenting Bondholders, to present competing proposals. Accordingly, on the Petition Date, the Debtor and Savitr entered into the Investment Agreement. Approved by the Court on January 20, 2011, the Investment Agreement provided the Debtor with three avenues toward a restructuring: (a) successful prosecution of the Original Plan, which would have provided Savitr 100% of the equity in the reorganized Debtor in exchange for a $45 million equity infusion, (b) the opportunity, within the Solicitation Period (as defined in the Investment Agreement), to solicit a Superior Proposal, or (c) entertain Superior Proposals outside the Solicitation Period; with a payment of a break-up fee and expense reimbursement to Savitr in the event that the Debtor enters into an alternative transaction.

15. Shortly after the filing of the Original Plan, the Consenting Bondholders submitted a refined proposal to the Debtor. For approximately a month, the Debtor and the Consenting Bondholders negotiated to eliminate contingencies to the implementation of the transaction contemplated by that proposal and finalize the necessary documents. Once that was achieved, the Debtor's board of directors determined that the Bondholder Proposal constituted a Superior Proposal, and, accordingly, authorized the Debtor to enter into the Plan Support Agreement, Exit Financing Letters and the DIP Financing Letters.[2]

---

[2] The Debtor will seek approval of the debtor in possession financing provided by the DIP Financing Letters by separate motion.

## The Plan Support Agreement[3]

16. In broad terms, pursuant to the Plan Support Agreement, the Debtor and the Consenting Bondholders have agreed to the terms of the Plan, which are set forth on the Plan Term Sheet. The Debtor has further agreed to file the Plan and the Consenting Bondholders have agreed that, subject to proper solicitation under section 1125 of the Bankruptcy Code, they shall vote in favor of and support the Plan.

17. The Plan Support Agreement contains a number of additional undertakings for the Debtor, including, among other things, that the Debtor will (a) no later than March 7, 2011, file the Plan and Disclosure Statement with terms consistent with provisions of the Plan Support Agreement and the Plan Term Sheet attached thereto and in a form satisfactory to the Consenting Bondholders; (b) no later than March 7, 2011, file the Plan Support Agreement itself; (c) take actions to terminate and/or reject certain of the Debtor's contracts; (d) no later than March 15, 2011 (or such other date as closely proximate thereto as possible that can be obtained from the Bankruptcy Court) obtain entry of an order by the Bankruptcy Court approving the Plan Support Agreement, which order shall be satisfactory to the Consenting Bondholders; (e) no later than March 22, 2011 (or such other date as closely proximate thereto as possible that can be obtained from the Bankruptcy Court) obtain entry of an order by the Bankruptcy Court approving the Disclosure Statement, which order shall be satisfactory to the Consenting Bondholders; (f) confirm and obtain entry of an unstayed order by the Bankruptcy Court confirming the Plan no later than May 2, 2011 (or such other date as closely proximate thereto as possible that can be obtained from the Bankruptcy Court) which order shall be

---

[3] The summary of transactions contained within the Plan Support Agreement is qualified in its entirety by the actual terms and conditions set forth in the Plan Support Agreement. To the extent any descriptions herein differ from those in the Plan Support Agreement, the terms and conditions set forth within the Plan Support Agreement shall control.

satisfactory to the Consenting Bondholders; and (g) cause the Effective Date of the Plan to occur no later than May 16, 2011.

18. In addition to their obligations to support, and vote in favor of, the Plan, the Plan Support Agreement provides that the Consenting Bondholders shall not, directly or indirectly: (a) take or direct the Indenture Trustee to take any enforcement actions pursuant to the Indenture, or (b) sell, pledge, hypothecate, or otherwise transfer or assign any of its Bonds, or any option, right to acquire, or voting, participation, or other interest therein, except to a purchaser who assumes the Consenting Bondholders' obligations under the Plan Support Agreement.

19. By its terms, the Plan Support Agreement will terminate, without further action by any of the parties, upon certain events, including, among other things: (a) upon the sale by Molecular Insight of any material portion of its assets, (b) if the Debtor's board of directors determines to pursue an Alternative Transaction (as defined in the Plan Support Agreement); (c) if the Plan does not become effective by 5:00 p.m. (EST) on May 16, 2011, unless such date is extended by written agreement of the Required Consenting Bondholders (as defined in the Plan Support Agreement); or (d) as and when provided by written agreement by each of the parties thereto to terminate the Plan Support Agreement.

20. The Plan Support Agreement may be terminated by written notice to the other parties by: (a) Molecular Insight, (i) upon a breach in any material respect by the Consenting Bondholders of its or their respective obligations thereunder, and such breach has not been cured within ten (10) days following receipt by the Consenting Bondholders, as applicable, from Molecular Insight of such breach, or if such breach is not capable of being cured; or (ii) if Molecular Insight enters into a written commitment, understanding or arrangement with respect

to an Alternative Transaction; or (b) a supermajority of the Consenting Bondholders, (i) upon a breach in any material respect by Molecular Insight of its respective obligations hereunder and such breach has not been cured within ten (10) days following receipt by Molecular Insight from the Consenting Bondholders of such breach, or if such breach is not capable of being cured; or (ii) if Molecular Insight enters into a written commitment, understanding or arrangement with respect to an Alternative Transaction.

## **The Exit Financing Letters**[4]

*The Exit Commitment Letter*

21. Pursuant to the terms of the Exit Commitment Letter, entered into by and among the Debtor and the Committed Exit Lenders, each Committed Exit Lender has committed to provide a specified portion of a senior secured term loan facility (the "Exit Facility") in an aggregate amount not to exceed $40 million (the "Exit Financing") to the Debtor. Moreover, each Committed Exit Lender has reserved the right to syndicate all or a portion of its financing commitment to any institution or fund that is (a) an affiliate of such Committed Exit Lender or (b) a Bondholder (collectively, the "Exit Lenders"). The commitment of each Committed Exit Lender is subject to, among other things, the negotiation, execution and delivery of a definitive credit agreement substantially the same as the draft Credit Agreement attached to the Exit Commitment Letter as Annex 1 (the "Exit Credit Agreement").

22. The Exit Commitment Letter also provides that the Debtor will indemnify the Exit Lenders for a broad range of losses, claims, costs, expenses, damages or liabilities, as set forth in paragraph 5 thereof.

---

[4] The summary of transactions contained within the Exit Commitment Letter and Exit Fee Letter are qualified in their entirety by the actual terms and conditions set forth in the Exit Commitment Letter and Exit Fee Letter. To the extent any descriptions herein differ from those in any of the Exit Financing Letters, the terms and conditions set forth within the Exit Financing Letters shall control.

23. The following is a summary of the terms of the Exit Facility, as set forth in the Exit Financing Letters and the Exit Credit Agreement:

*Amount*: $40,000,000.

*Maturity*: Fifth anniversary of the closing date of the Exit Facility

*Collateral*: A first priority perfected security interest in substantially all of the Debtor's now owned or hereafter acquired property and assets

*Interest Rate*: 17.5% per annum

*Use of Proceeds*: To be used (a) to pay all principal, interest and other obligations of the Debtor under the DIP Facility (as defined in the Exit Credit Agreement), (b) to pay fees, costs and expenses incurred directly in connection with the Transactions (as defined in the Exit Credit Agreement); (c) to pay fees, costs and expenses of the advisors and professionals for the Bondholders represented by Bingham McCutchen LLP that have not been paid in full in accordance with the final Cash Collateral Order (as defined in the Exit Credit Agreement) or to otherwise reimburse such Bondholders for any amount of such fees, costs or expenses paid by such Bondholders during the Chapter 11 Case; and (d) for working capital and general corporate purpose of the Reorganized Debtor.

*Other Terms*: The Exit Facility will contain affirmative and negative covenants, representations and warranties and customary events of default.

*The Exit Fee Letter*

24. Pursuant to the terms of the Exit Fee Letter, also entered into between the Debtor and each of the Committed Exit Lenders, the Debtor has agreed to provide, in consideration of the agreements contained in the Exit Commitment Letter and among other things, (a) a fee in an amount equal to $2 million, to be fully earned upon acceptance by the Debtor of the Exit Commitment Letter and payable to the administrative agent under the Exit Facility, for the ratable benefit of each Committed Exit Lender, on the closing date (the "Closing

Date") of the Exit Facility (the "Upfront Fee") (b) a fee in the form a seven-year warrants (the "Pro Rata Warrants") to purchase shares of the Reorganized Debtor's Series A Convertible Preferred Stock, with an exercise price of $0.01 per share, exercisable for an aggregate of 25% of the outstanding shares of common stock of the Reorganized Debtor calculated on an as-converted basis (excluding the Warrants), to be fully earned upon the Debtor's acceptance of the Exit Commitment Letter and to be issued on the Closing Date to the Committed Exit Lenders, ratably in accordance with the pro rata percentages set forth in Exhibit A to the Exit Fee Letter (the "Exit Lender Fee"); and (c) a backstop fee in the form of seven-year warrants (the "Backstop Warrants" and together with the Pro Rata Warrants, the "Warrants") to purchase shares of the Reorganized Debtor's Series A Convertible Preferred Stock, with an exercise price of $0.01 per share, exercisable for an aggregate of 6.5% of the outstanding shares of common stock of the Reorganized Debtor calculated on an as-converted basis (excluding the Warrants), to be fully earned upon the Debtor's acceptance of the Exit Commitment Letter and to be issued on the Closing Date to the Committed Exit Lenders providing a backstop under the Exit Facility, ratably in accordance with the pro rata percentages set forth in Exhibit B to the Exit Fee Letter (the "Backstop Fee").

**Basis for Relief Requested**

25. Under section 363(b)(l) of the Bankruptcy Code, the Court may authorize a debtor in possession to "use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(l). A debtor in possession's decision to use, sell, or lease assets outside the ordinary course of business must be based upon its sound business judgment. See, e.g., In re SW Boston Hotel Venture, LLC, et al., 2010 Bankr. Lexis 2924 at *8 (Bankr. D. Mass. Aug. 27, 2010) (stating that "[c]ourts approve a Chapter 11 debtor in possession's use, sale or lease of property of the estate where the debtor has used reasonable

business judgment and articulated a business justification for such use"); White v. Official Committee of Unsecured Creditors (In re Cadkey Corp.), 317 B.R. 19, 22-23 (D. Mass. 2004); In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (stating that a debtor's business decision in entering into agreements should be approved by the court unless it is shown to be so unreasonable that it could not have been the product of sound business judgment).

26. A debtor's business decision "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Logical Software, 66 B.R. 683, 686 (Bankr.D.Mass. 1986). See also Aerovox, Inc., 269 B.R. at 80 (quoting Logical Software).

### A. The Plan Support Agreement Should be Approved

27. The Debtor submits that entering into the Plan Support Agreement represents a sound exercise of the Debtor's business judgment and should be approved as in the best interests of the Debtor's estate, its creditors and other parties in interest. The Plan Support Agreement ensures the support of virtually the entire class of secured Bondholders, which accounts for the overwhelming majority of the Debtor's creditors. This support eliminates what would have otherwise been a potentially protracted litigation over restructuring transaction contemplated by the Original Plan and clears the path towards confirmation of a plan of reorganization. Pursuant to the Plan, the Debtor will eliminate a substantial amount of debt from its balance sheet. The Plan provides for a balance sheet restructuring that will reduce the Debtor's debt by approximately $162 million and facilitate a new capital infusion of approximately $40 million.

28. The Plan Support Agreement, together with the provisions of the Plan Term Sheet annexed thereto, provide the framework for the Debtor's restoration to liquidity and

successful emergence from chapter 11. For the foregoing reasons, the Debtor's determination to enter into the Plan Support Agreement should be approved.

**B.     The Exit Financing Letters Should be Approved**

29.     The Debtor submits that entry into the Exit Commitment Letter and the Exit Fee Letter represents a sound exercise of its business judgment. The Exit Facility provides the Debtor the liquidity that is absolutely central to its ability to consummate the Plan and make the distributions provided for thereunder, and to emerge from bankruptcy with sufficient capital to ensure a successful reorganization.

30.     Moreover, the Upfront Fee, the Exit Lender Fee and the Backstop Fee (collectively, the "Fees") and Indemnities provided by the Debtor as set forth in the Exit Financing Letters provide reasonable consideration for the substantial benefits that will inure to the Debtor and its estate from the Exit Facility, and, ultimately, through confirmation and consummation of the Plan.

31.     Finally, the Debtor respectfully requests that the Court find that the Debtor's entry into, and performance under the Plan Support Agreement and Exit Financing Letters does not constitute the solicitation of a vote on a plan of reorganization. Inasmuch as no vote on any plan of reorganization is being solicited by or in connection with the Plan Support Agreement or the Exit Financing Letters and that the Debtor intends to solicit its creditors pursuant to a Court-approved disclosure statement, the Debtor submits that the relief requested herein is appropriate and reasonable under the circumstances.

**NOTICE**

32.     Notice of the relief requested in the Motion has been given to: (a) the Office of the United States Trustee for the District of Massachusetts; (b) counsel to the Indenture Trustee; (c) counsel to the Bondholders; (d) the Debtor's twenty largest unsecured creditors as filed on

the Petition Date; (e) the Office of the United States Attorney for the District of Massachusetts; (f) counsel to Savitr; (g) the Internal Revenue Service; (h) the Massachusetts Department of Revenue; (i) Office of the Attorney General of the Commonwealth of Massachusetts; (j) the United States Securities and Exchange Commission; and (k) any party that is entitled to receive notice in this Chapter 11 Case pursuant to Bankruptcy Rule 2002.  This Motion (and other relevant case information) will also available at www.omnimgt.com/molecular.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

Document Page 15 of 15

WHEREFORE, the Debtor respectfully requests that this Court enter an order granting (a) the relief requested herein, and (b) such other and further relief as is just and proper.

    Respectfully submitted,

    MOLECULAR INSIGHT PHARMACEUTICALS, INC.
    By its counsel,

    Kenneth H. Eckstein
    P. Bradley O'Neill
    KRAMER LEVIN NAFTALIS & FRANKEL LLP
    1177 Avenue of the Americas
    New York, New York 10036
    Tel: (212) 715-9100
    Fax: (212) 715-8000
    Email: keckstein@kramerlevin.com

    and

    /s/ Alan L. Braunstein
    Alan L. Braunstein (BBO #546042)
    Guy B. Moss (BBO #357960)
    Christopher M. Candon (BBO #650855)
    RIEMER & BRAUNSTEIN LLP
    Three Center Plaza
    Boston, Massachusetts 02108
    Tel: (617) 523-9000
    Fax: (617) 880-3456
    Email: abraunstein@riemerlaw.com

Dated: March 7, 2011